```
         IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,   )
                            )
         Plaintiff,         )  Case No. 3:20-cr-00223-IM
                            )
    v.                      )
                            )
JACOB MICHAEL GAINES,       )  July 16, 2020
                            )
         Defendant.         )  Portland, Oregon
_____)
```

## Detention Hearing

(By Videoconference)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT JUDGE

```
 1
 2                           APPEARANCES
 3
 4   FOR THE PLAINTIFF:     Mr. Christopher L. Cardani
                            United States Attorney's Office
 5                          1000 S.W. Third Avenue, Suite 600
                            Portland, OR 97204
 6
 7
 8   FOR THE DEFENDANT:     Mr. Bryan Francesconi
                            (By videoconference)
 9                          Federal Public Defender's Office
                            101 S.W. Main Street, Suite 1700
10                          Portland, OR 97204
11
12
13   COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                            United States District Courthouse
14                          1000 S.W. Third Ave., Room 301
                            Portland, OR  97204
15                          (503) 326-8188
16
17
18
19
20
21
22
23
24
25
```

```
 1                    (P R O C E E D I N G S)
 2                 (July 16, 2020; 3:03 p.m.)
 3                           * * * * *
 4          THE COURT:  Mr. Cardani, can you call the case,
 5  please.
 6          MR. CARDANI:  Yes, Your Honor.  Can you hear me okay?
 7          THE COURT:  Yes.
 8          MR. CARDANI:  This is the time set for United States
 9  of America versus Jacob Michael Gaines.  It's Magistrate
10  No. 3:20-00153.  It's on before Your Honor because the
11  government has filed a motion to revoke a release order imposed
12  by a magistrate judge.
13          Chris Cardani for the government.  I believe
14  Mr. Francesconi is appearing by video for the defendant, and
15  the defendant is on video as well from downstairs.
16          We're ready to proceed.
17          THE COURT:  Thank you.
18          Can you speak to me about your client's appearance by
19  video, Mr. Francesconi.
20          MR. FRANCESCONI:  Of course, Your Honor.  Good
21  afternoon, Your Honor.  Bryan Francesconi, Oregon Federal
22  Defender.
23          Your Honor, I'm present by video.  Mr. Gaines is
24  present and in custody.  Mr. Gaines and I spoke on the phone.
25  He does understand today's hearing is going to be by video.  He
```

1  does consent and requests to proceed like that.
2          THE COURT: Is that right, sir? You agree to appear
3  by video?
4          THE DEFENDANT: Yes, Your Honor.
5          THE COURT: I do find appropriate waiver and also
6  that the interests of justice favor this method of proceeding,
7  in light of chief judge's standing order, the governor's order,
8  and our current pandemic. So we'll proceed with the defendant
9  appearing today by video.
10         I've read, Mr. Cardani, what you've submitted. It's
11 your motion. I'll let you add anything you want to add.
12         MR. CARDANI: May I remain seated, Your Honor?
13         THE COURT: Yes.
14         MR. CARDANI: I'm not going to repeat everything if
15 the Court has taken a look at the papers. This is a very
16 serious assault on a marshal, Marshal Keen (ph), after an
17 attack on the courthouse.
18         I have a video I'd like to play for the Court, only a
19 minute long. But before I do, I'd just like to make a few
20 points to kind of set it up, and there are things that not in
21 the video that are important to the context of the video.
22         THE COURT: Go ahead.
23         MR. CARDANI: What you will see on the video that I'm
24 about to play is Mr. Gaines outside the wooden barricaded door
25 on the south side of the courthouse, 1:00 on a Saturday

morning. You'll see Mr. Gaines take this device, a four-pound sledgehammer, over his head for a period of nine seconds. During that nine seconds, witnesses, the victims have told agents that during those nine seconds, this defendant was telling them through the door words to the effect, "I can see you MF'ers, you're going to have to come out, you're going to have to kill me," repeated three, maybe four times while the hammer was cocked.

    The defendant is a rather large man, six foot, 295 pounds, and our evidence is that he had already punched this hole right through the barricade. So the marshals are about to respond because they're attempting to do their jobs, protect the building and respond to the assault. And from there you'll see Mr. Gaines respond with that hammer.

    There are a series of back and forths with Mr. Gaines as the marshals attempt to apprehend him, but I ask the Court to really reflect on the one -- the last strike, where he was back and tomahawks the marshals. We think that's the most serious blow and shows the dangerousness of this defendant.

    May I play the video?

    THE COURT: Yes.

    (A video is played.)

    MR. CARDANI: Your Honor, again, a very serious assault, and I submit to the Court if these agents were not wearing tactical gear and helmets, we would have serious

1   injuries on behalf of the victims, which was intended by the
2   defendant, especially by that tomahawk blow, a six-foot,
3   295-pound man with a four-pound hammer, blunt end that he
4   already used to poke a hole in the courthouse doors.  Clearly
5   an attempt to breach the courthouse.  He had fellow agitators
6   around, and who knows what might have happened if the marshals
7   didn't do their job and stop the conduct.
8           The other side of that hammer is pointed, clearly a
9   dangerous or a deadly weapon.  And he has been charged with
10  that conduct.  The assault statute allows us to charge assault
11  in different manners.  The most serious form is when somebody
12  uses a deadly or dangerous weapon, and that's how it's been
13  alleged in the complaint, and the matter has just been
14  submitted to the grand jury.
15          So, as I said, on the 3142(g)(1) and (g)(2) factors,
16  Your Honor, the conduct is violent, the conduct is serious, and
17  the evidence is strong, all factors that this Court can take
18  into account in determining whether there are any conditions
19  that can be fashioned to release him and safeguard the
20  community.  We submit he's a danger not only to the community
21  but to law enforcement in particular.
22          The other factors also weigh in favor of detention.
23  Those are reviewed from the Pretrial report.  The personal
24  characteristics of this defendant are such that also indicate
25  that there aren't a combination of conditions that will

reasonably produce his appearance to face justice for this terrible assault. The Court sees the lack of community ties, the personal characteristics of the defendant is unstable, nonexistent employment, drug, alcohol abuse. And in terms of stable residence, he lives in a bus, as I said in my brief. He lives on something that has four wheels and can be easily moved around, as he has done in the past few years, living the transient life that he told the Court about.

He has indicated inside this bus are three weapons, two handguns and a shotgun. Obviously, a rather disturbing fact, considering his mental health, his drug use, and the mindset of someone who would come down to the courthouse at 1:00 in the morning and join fellow agitators and attempt to bait the police by breaching the building, evoking a response, and then trying to bring this device down on the heads of federal agents just trying to do their jobs.

I submit, Your Honor, that to monitor someone like this pretrial, especially in this COVID environment, I think is darned near impossible. His mobility, no job, his whereabouts on a regular basis, his mental health, we just feel that is -- it is just too risky to release him pending trial.

On a side note, there is a woman in the video next to him. We don't have confirmation on this, but law enforcement seems to believe that that may be his wife. We don't have confirmation on that.

```
 1              THE COURT:  That they seem to believe it might be his
 2   wife, what use do you want me to make of that today?
 3              You can leave your mask on.  You don't have to keep
 4   touching it.  I'm here behind glass.
 5              MR. CARDANI:  Can I keep it down?
 6              THE COURT:  No.
 7              MR. CARDANI:  It's difficult to talk and fog glasses
 8   and such.
 9              Your Honor, the only reason I bring that up, if the
10   Court is considering releasing him, where is he going to go?
11   Who is going to be with him?  And the obvious candidate here
12   would be his wife.  And if that were the case, we would ask
13   that Pretrial interview her and determine if she is the one who
14   was there with him or not.  I queried the Pretrial Services
15   officer today to see if I could get some corroboration of that,
16   and they were unable to provide any information to me beyond
17   the report.  That's why I bring that up, Your Honor.
18              THE COURT:  Thank you.  Thank you very much.
19              Mr. Francesconi.
20              THE COURTROOM DEPUTY:  Sir, you were just muted.  If
21   you can start that over.
22              MR. FRANCESCONI:  Yes, of course.  My apologies.
23              Your Honor, I'll only briefly talk about the events
24   of the allegations of this case.  As the Court is aware, the
25   allegations are the least important consideration.
```

1    I provided the Court with that video beforehand as
2 well.  I don't know if the Court had the opportunity to see it.
3 On that video you can see Mr. Gaines pushing on the door to
4 keep the door closed.  That means that he was trying not to
5 engage with the officers.  He was trying not to have an
6 interaction with the officers, ostensibly probably because he
7 had potentially caused some damage to the door, which had been
8 his goal, and that he was looking to get in trouble.
9    As the officers came out, they immediately grabbed
10 his left hand, and he stumbled backwards.  So it's not a
11 circumstance where there was officers seeing a weapon and
12 saying, "You need to drop that, sir," pulling a weapon and then
13 saying, "Step away, put your hands behind your back."  This was
14 the officers stepped out and immediately grabbed Mr. Gaines.
15    Now, that's not the officers' fault.  I'm not saying
16 that the officers are at fault here.  They could have gone out
17 into a different entrance, which would have made the situation
18 better, but again -- but the point is it was a very, very fast
19 interaction with him, immediately grabbing Mr. Gaines as soon
20 as they saw him, him stumbling backwards, and then pretty
21 quickly after the hammer fall, as the government calls it, he
22 was tackled to the ground by six officers.  No officers in this
23 case had any bruises or injuries of any kind, and they were all
24 wearing military-style gear.
25    Talking about my client's mental health concerns, my

client has ADHD, Your Honor.  I don't hardly believe ADHD is the kind of a mental health concern that would mean a United States citizen cannot possess a weapon, or there's a heightened level of concern about him being on the streets.

The reality is that before this Court is a 23-year-old man with zero criminal history.  This is the first time in his life he has ever been arrested.  Furthermore, Judge Beckerman and United States Pretrial both were comfortable with the situation of where he lives.  He doesn't have an address. It would be great if every one of our citizens had an address, and it's true he doesn't have one, but that is not an overtly strong concern in this case because my client and his wife live in a bus at a very particular place in North Portland.  I didn't put that place in, Your Honor, but Your Honor has it in the Pretrial report.  So Pretrial was comfortable with this situation because Pretrial knows where my client would be.

Pretrial didn't ask for a GPS monitor, but if the Court is less comfortable -- Judge Beckerman was comfortable, but if Your Honor is less comfortable, there's plenty of intermediate measures.  We can put a GPS on my client.  We can even potentially have -- I don't know if the Court can, but I'm presuming the Court could order a boot for the bus.

My client is looking to move the bus into an RV park. If it was in an RV park, we wouldn't even be having this conversation.

1    The reality is Mr. Gaines has not been in trouble
2    before.  As the Court may have heard me say this morning, most
3    of the individuals downtown protesting are there for laudable,
4    important reasons.  Unfortunately, this is one of those
5    situations where that did go too far.  Mr. Gaines is not saying
6    it didn't go too far.
7    Mr. Gaines, when asked about going to another
8    protest, said, "I've learned my lesson.  I want nothing to do
9    with no protest whatsoever.  I will stay as far away as you all
10   want me to stay."
11   He has connections here with his wife, who is
12   working.  The two of them have -- are connected to this
13   community, and given the fact that this is not a person who has
14   a history of missing court, this is not a person who has had
15   any sort of history of violence.  Mr. Gaines doesn't have a
16   passport and he hasn't been outside of this country.
17   I understand the government has concerns in this
18   case, but the reality is, given Mr. Gaines' lack of criminal
19   history, lack of demonstrated mistakes in the past, this Court,
20   like Judge Beckerman and United States Pretrial, should be
21   comfortable in saying we know where he's going to be, we can
22   always put a GPS on him if we're concerned, we can always put a
23   boot on him if we're concerned -- on the bus if we're
24   concerned.  We can even put him in the RRC.  We are so many
25   steps away from incarceration being the necessary final step at

1   this point.
2       For those reasons, we're asking for Mr. Gaines to be
3   released
4       THE COURT:  Thank you very much.
5       The parties have accurately set up the standards in
6   play in the briefing in this case, and those are the standards
7   I'm looking at to determine both -- well, to determine what
8   ought to happen here both as to flight risk and danger.
9       And I'm going to talk about different factors, and
10  it's true that for in this case probably each one of them -- in
11  many cases no one factor is enough to justify an answer one way
12  or the other, nor is one factor required to be criminal,
13  somehow.  So, for example, one that both parties discussed is
14  that the defendant lives in a mobile school bus, a bus that's
15  functional and can drive around.  So there's nothing illegal or
16  wrong about that, and by itself wouldn't justify detention.
17  There's nothing nefarious about it.  But when I just look at a
18  series of facts about whether on this question he's a flight
19  risk, that's one thing I need to take into account, and it cuts
20  against the defendant somewhat.  It's an modest factor that
21  says, well, he -- you know, he could drive the bus away.
22      The fact -- there are several factors that concern me
23  both as to flight risk and danger.  Certainly as to flight
24  risk, the defendant is brand-new to this community, with no
25  real ties of his own.  He's not employed.  He doesn't have

family here.  He doesn't have a stable residence.  He doesn't have any sort of history here in this community or even in this area.  On the plus side, his wife now has a job here and he is married to someone who apparently plans to stay, so that cuts in his favor.  But generally speaking, he's the sort of person who can't claim community ties as a reason to make arguments in his favor on flight risk, and the government can certainly point to those to make its arguments that he is a flight risk.

There's also the concern as to flight risk about his history of unstable employment generally.  Now, again, there's nothing wrong with his employment history, it's not morally inappropriate in any way, it's just that he doesn't have a history of setting down roots anywhere and making himself a long-term employee somewhere.  So that's another factor against him.

The Pretrial Service report certainly mentions, independent of his ADHD, both drug and alcohol concerns.  And the alcohol concern in particular is one that is mentioned in the Pretrial Service report and makes him somewhat less reliable in terms of hanging around and making his appointments.

There are several concerns that have to do with his danger to the community.  So I already mentioned his problem with alcohol, at least as reported by Pretrial Services.

The facts surrounding the incident itself as to their

1  strength are what they are.  The video is there in front of me.
2  There's strong evidence of the crime, but I agree with the
3  repeated expression that that's the -- by far the least
4  important factor here, and I place less weight on that than
5  just on the context, in terms of what it means about the
6  possibility for violence.  So this is a person who against
7  significant odds, the sort of odds that would deter most
8  sensible people from entering into the fray, enters the fray
9  with law enforcement, bashes on the door and then, in my view,
10 from the video, continues the fight even as officers encounter
11 him, tries to get in one last blow, one that ended up not being
12 serious but could in fact have been very serious.  And that
13 concerns me.
14          I have information that I'm able to rely on at least
15 that suggested an unstable encounter, that is, that in bashing
16 on the door, he essentially said, "You'll have to kill me,"
17 presumably to get me to stop.
18          So I'm concerned.  I'm concerned I have someone who
19 has got no stable employment, no contacts with the community,
20 no history in the area, a history or a concern about both drug
21 and alcohol problems, some serious indication of the kinds of
22 mental health issues that make him unstable.  I'm not referring
23 to his ADHD but to other mental health problems when I look at
24 the context of what happened.  It's, of course, perfectly legal
25 for him to own guns, but a concern.  And that's a concern that

1  can be dealt with, but certainly a concern and one that raises
2  the ante at least on the risk of dangerousness.
3          Now, I think there may well be ways in which some of
4  these can be handled down the line.  I don't think they can be
5  taken care of today, but if I had a case down the line where
6  the guns had been gotten rid of and the bus was parked
7  somewhere stable, and other factors like an actual assessment
8  of mental health and drug and alcohol problems had occurred,
9  those are the sorts of things that might change the outcome for
10 a young man who otherwise has no criminal history.
11         I'm not prepared to release him today.  I'm going to
12 detain him today.  I'll say that it's not my expectation that
13 he should be detained all the way through pending trial, but
14 instead that with the help of Pretrial Services, these steps
15 should be taken -- some of them pretty simple to do, others
16 requiring professional evaluation -- and then I'll take another
17 look at it when that has happened.
18         But in the interim, for today's purposes, I
19 countermand the decision of the magistrate judge, and I'm
20 ordering him detained as both a flight risk and a danger for
21 the time being.
22         Any questions about that from the United States?
23         MR. CARDANI:  No, Your Honor.
24         THE COURT:  For the defense?
25         MR. FRANCESCONI:  I just want to confirm.  If we were

1 to schedule another hearing on this matter, it should be
2 directly with you, not with the magistrate?
3      THE COURT: Yes.
4      All right. Thank you all.
5      MR. FRANCESCONI: Thank you.
6      THE COURTROOM DEPUTY: Court is in recess.
7      (Proceedings concluded at 3:25 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


/s/Bonita J. Shumway                    October 14, 2020
_____        _____
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter